**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| PATRICK HARRIS HOPE, Individually and on Behalf of All Others Similarly Situated, | Case No. 24-cv-00305 |
| Plaintiff, | **CLASS ACTION** |
| | **JURY TRIAL DEMANDED** |
| v. | |
| AGILON HEALTH, INC., STEVEN J. SELL, AND TIMOTHY S. BENSLEY, | |
| Defendants. | |

**CLASS ACTION COMPLAINT FOR VIOLATIONS**
**OF THE FEDERAL SECURITIES LAWS**

Plaintiff Patrick Harris Hope ("Plaintiff"), by and through Plaintiff's counsel, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, including the investigation of Plaintiff's counsel, which included, among other things, a review of Defendants' (defined below) United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by agilon health, inc. ("agilon" or the "Company"), analyst reports and advisories about the Company, media reports concerning the Company, judicial filings and opinions, and other publicly available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.     **NATURE OF THE ACTION AND OVERVIEW**

1.     This is a federal securities class action on behalf of a class of all persons and entities who purchased or otherwise acquired agilon common stock between November 4, 2022, and

January 4, 2024, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, promulgated thereunder, and are alleged against agilon and certain of the Company's senior executives, including Steven J. Sell (the Company's Chief Executive Officer) and Timothy S. Bensley (the Company's Chief Financial Officer) (collectively, "Defendants").

2.      agilon is a Delaware corporation with principal executive offices in Austin, Texas. agilon is a healthcare and technology company that acts as an intermediary between physician groups that provide medical services to senior citizens and Medicare and Medicare Advantage insurers. Specifically, agilon takes payments from Medicare and Medicare Advantage insurers—which are a fixed amount per patient based upon the patient's underlying medical conditions—and provides fixed payments to physician groups regardless of the services ultimately provided to the patients. The goal is to have primary care physicians utilize preventive care and similar, less expensive care options to reduce the likelihood that patients will require more expensive care, such as hospitalization. As part of this model, the Company is required to pay for other patient costs, such as hospital visits, specialists, drugs, and outpatient surgeries. Accordingly, agilon maximizes profit by keeping the total costs incurred by each patient below what the Company receives from the government and insurers.

3.      One of agilon's key financial metrics is "medical margin," which the Company defines as medical services revenue less medical services expenses. agilon's revenue is largely predictable based upon its payments from Medicare and Medicare Advantage insurers, as is the portion of its medical costs that consist of fixed payments to physician groups. The Company's costs related to hospital visits, specialists, drugs, and outpatient surgeries are variable, however, based on actual usage by patients.

4.      The Class Period begins on November 4, 2022, to coincide with agilon's announcement of its financial results for the third quarter of 2022 (filed after the market closed the prior evening).   In connection with these results, Defendant Sell emphasized the Company's "[m]embership, revenue and medical margins were above the high end of our guidance ranges" and indicated that, "[t]his year, we are driving substantial growth in medical margin PMPM [per member per month]."  Defendant Bensley stated that, "[f]or the full year 2022, we have raised our membership, revenue and medical margin outlook to reflect the strong performance in our [Medicare Advantage] business."

5.      Throughout the Class Period, Defendants repeatedly touted the strength of the Company's medical margin.  Additionally, Defendants downplayed the significant cost pressures on the Company's medical margin and profitability.  For example, on March 1, 2023, Defendant Sell explained on the Company's fourth quarter and fiscal year 2022 investor earnings call that agilon's "medical margin for 2023 is projected at nearly $550 million, making agilon and our partners an incredible catalyst for stabilizing and growing primary care nationally."  The expected medical margin disclosed by Defendant Sell represented an 80% year-over-year increase.

6.      On June 7, 2023, just days before other health insurers such as UnitedHealth Group Inc. ("UnitedHealth") and Humana Inc. ("Humana") reported significant increases in medical costs, Defendant Bensley, speaking at an analyst-sponsored healthcare conference, reported that Defendants "expect this year to generate somewhere around $550 million of medical margin," noting that the Company has seen "steady progress on medical margin upwards."

7.      On August 3, 2023, during the Company's second quarter 2023 investor earnings call, Defendant Sell highlighted the Company's ability to predict its costs, explaining that, "[i]n terms of leading indicators and visibility" and "[f]rom an operational standpoint, we are not just

receivers of macro utilization trends"—"[o]ur teams are actively managing utilization on the ground every day."

8.      Investors began to learn the truth about the cost pressures impacting the Company's medical margin and profitability on November 2, 2023, when the Company announced its third quarter 2023 financial results after the market closed.  Critically, agilon reported a net loss of $31 million for the third quarter of 2023 and slashed its fiscal year 2023 medical margin to a range between $455 million and $470 million.  According to Defendant Sell, the reduced medical margin guidance reflected "a step-up in Q2 utilization in [Medicare Advantage]."  Defendant Sell also assured investors that the Company's more conservative approach to guidance "should reduce the risk of negative claims development next year."

9.      On this news, the price of agilon common stock declined $3.78 per share, or more than 22% over two trading-days, from a close of $16.89 per share on November 2, 2023, to close at $13.11 per share on November 6, 2023.

10.      A week later, after the market closed on November 10, 2023, investors gained further insight into these issues when analysts with Wells Fargo Securities, LLC issued a report cutting its price target for Company common stock from $23.00 per share to $16.00 per share and reducing its financial estimates for the Company, citing the "surprising" cost pressures impacting the Company's medical margin in light of Defendants' "continued confidence" in agilon's business model.

11.      On this news, the price of agilon common stock declined $0.15 per share, or more than 1%, from a close of $11.32 per share on November 10, 2023, to close at $11.17 per share on November 13, 2023.

12.     Then, on November 21, 2023, analysts with Deutsche Bank Securities Inc. downgraded agilon from a rating of "Buy" to "Hold," reasoning that the Company's "messy" third quarter 2023 results and "overly optimistic" medical margin financial guidance undermined analysts' confidence that agilon would meet its financial expectations in 2024 and beyond.

13.     On this news, the price of agilon common stock declined $0.52 per share, or 4.5%, from a close of $11.52 per share on November 20, 2023, to close at $11.00 per share on November 21, 2023.

14.     Investors more fully learned the truth about the cost pressures on the Company's medical margin and profitability before the market opened on January 5, 2024, when agilon updated its fiscal year 2023 financial results and provided its initial outlook for 2024. Critically, agilon further slashed its 2023 medical margin guidance more than $100 million, to a range between $340 million and $360 million, due to "higher-than-expected medical costs." This represented a decline of more than 34% from the $550 million in medical margin it had predicted.

15.     On the related investor guidance call, Defendant Sell claimed that increased medical costs only "became visible to us starting in mid-December, as we closed our November results," and indicated that agilon was "seeing cost trends that were 2 to 3x higher [than] what we had seen in 2022 in key areas like specialist costs, outpatient surgeries and Part B drugs." Despite his earlier claims that "we are not just receivers of macro utilization trends" and "[o]ur teams are actively managing utilization on the ground every day," Defendant Sell acknowledged that agilon "failed to recognize these elevated cost trends" and had "a data and analytics gap that led to [the Company] being late in both recognizing the magnitude and source of the utilization shifts." Defendant Sell further indicated that the increased cost trends were expected to persist through 2024. Also on January 5, 2024, Defendant Bensley announced that he would retire in 2024.

16.    On this news, the price of agilon common stock plummeted $3.45 per share, or nearly 29%, from a close of $12.08 per share on January 4, 2024, to close at $8.63 per share on January 5, 2024.

17.    This Complaint alleges that, throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts, about the Company's business and operations.  Specifically, Defendants misrepresented and/or failed to disclose: (1) the severity and unpredictability of the cost pressures on the Company's medical margin and profitability; and (2) that, as a result, Defendants' representations about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

18.    As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's common stock when the truth was revealed, Plaintiff and other members of the Class (defined below) have suffered significant damages.

## II.    <u>JURISDICTION AND VENUE</u>

19.    Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

20.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

21.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because agilon is headquartered in this District and because many of the acts and conduct that constitute the violations of law complained of herein, including the

dissemination to the public of materially false and misleading information, occurred in this District.

22.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

23.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased agilon common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

24.     Defendant agilon is a Delaware corporation headquartered at 6210 E. Highway 290, Suite 450, Austin, Texas, 78723.

25.     Defendant Sell was, at all relevant times, agilon's President and Chief Executive Officer, and a Company Director.

26.     Defendant Bensley was, at all relevant times, agilon's Chief Financial Officer.

27.     Defendants Sell and Bensley are collectively referred to as the "Individual Defendants."

28.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of agilon's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each Individual Defendant was provided with copies of the Company's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to

material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

29.    agilon is a healthcare and technology company that acts as an intermediary between physician groups that provide medical services to senior citizens and Medicare and Medicare Advantage insurers.  Specifically, agilon takes payments from Medicare and Medicare Advantage insurers—which are a fixed amount per patient based upon the patient's underlying medical conditions—and provides fixed payments to physician groups regardless of the services ultimately provided to the patients.  The goal is to have primary care physicians utilize preventive care and similar, less expensive care options to reduce the likelihood that patients will require more expensive care options, such as hospitalization.  As part of this model, the Company is also required to pay for other patient costs, such as hospital visits, specialists, drugs, and outpatient surgeries.  Accordingly, agilon generates profit by keeping the total costs incurred by each patient below what the Company receives from the government and insurers.

30.    One of agilon's key financial metrics is "medical margin," which the Company defines as medical services revenue less medical services expenses.  agilon's revenue is largely predictable based upon its payments from Medicare and Medicare Advantage insurers, as is the portion of its medical costs that consist of fixed payments to physician groups.  The Company's costs related to hospital visits, specialists, drugs, and outpatient surgeries are variable based on actual usage by patients.

31.     agilon's common stock trades on The New York Stock Exchange under the ticker symbol "AGL."

**B.     Defendants' False and Misleading Statements**

32.     The Class Period begins on November 4, 2022, to coincide with agilon's announcement of its financial results for the third quarter of 2022 (filed after the market closed the prior evening).  In connection with the Company's investor earnings call held on November 3, 2022, Defendant Sell emphasized the Company's "[m]embership, revenue and medical margins were above the high end of our guidance ranges" and indicated that "[t]his year, we are driving substantial growth in medical margin PMPM [per member per month]."  Defendant Bensley stated "[f]or the full year 2022, we have raised our membership, revenue and medical margin outlook to reflect the strong performance in our [Medicare Advantage] business."

33.     Throughout the Class Period, Defendants repeatedly touted the strength of the Company's medical margin, downplaying the significant cost pressures on the Company's medical margin and profitability.

34.     For example, during the JPMorgan Healthcare Conference on January 9, 2023, Defendant Sell, when discussing the Company's "incredible growth" and ability to deliver from a margin perspective, touted that, "[i]n 2022, we stepped up both medical margin and adjusted EBITDA substantially."  As a result, Defendant Sell stated that, "today, we are providing 2023 adjusted EBITDA guidance of $75 million to $90 million, another meaningful step up in profitability."

35.     On March 1, 2023, the Company announced its fourth quarter and fiscal year 2022 financial results, and touted the growth of medical margin in relation to revenue, noting that "[m]edical margin represented 8.8% of revenue during the fourth quarter and 11.2% for the fiscal

year 2022, compared to 6.8% and 9.9% of revenue in the fourth quarter and full year 2021, respectively."

36.    On the related investor earnings call held that day, Defendant Sell boasted:

> Our medical margin for 2023 is projected at nearly $550 million, making agilon and our partners an incredible catalyst for stabilizing and growing primary care nationally. . . .

> Turning to 2023, our guidance reflects the momentum in our business as membership, revenue, medical margin and adjusted EBITDA are all projected to grow even faster than they did last year.

37.    At agilon's Investor Day conference on March 30, 2023, Defendant Bensley stated that:

> Adjusted EBITDA at agilon is inflecting in a positive way.  That's driven by -- that's a function of our accelerating growth, our improving unit economics, our maturing membership base as well as our continuing operating leverage.  All of that gives us high confidence in our 2026 outlook for members, medical margin.

38.    Defendant Bensley further exclaimed that:

> [W]e expect medical margin dollars to inflect up to about $550 million in 2023.  That's an 80% year-over-year increase from what we just reported for 2022.  And I think that's a real hallmark of the agilon model, our ability to grow medical margin at the same time that we're growing membership. . . .

> * * *

> [W]e're much more confident now in our ability to drive medical margin improvement through claims, control through all of these clinical initiatives we put out there.

39.    On May 9, 2023, on the Company's investor earnings call discussing the Company's first quarter 2023 financial results, Defendant Bensley explained that, for 2023, "[w]e anticipate medical margin in a range of $535 million to $560 million and adjusted EBITDA in the range of negative $3 million to positive $25 million."

40.     On May 11, 2023, speaking at the Bank of America Global Healthcare Conference, Defendant Bensley addressed the guidance he had discussed two days prior and indicated that "we're very comfortable with our full year medical margin guidance, and we reaffirm that guidance."

41.     During the William Blair Growth Stock Conference on June 7, 2023, Defendant Bensley, when discussing the growth trends of the Company's medical margin, emphasized that, "over time, our medical margin inflection has been tremendous at about a 60% [compound annual growth rate] or certainly in line . . . with what our membership [compound annual growth rate] has been, and we expect this year to generate somewhere around $550 million of medical margin," noting that the Company has seen "steady progress on medical margin upwards."

42.     On June 13, 2023, UnitedHealth, one of agilon's competitors, revealed that it was seeing "higher levels" of outpatient care activity and suggested that higher utilization rates were due to "pent-up demand or delayed demand being satisfied."  UnitedHealth further explained that it was "seeing very strong volumes" in certain areas, including ambulatory surgery, and an overall "higher number of cases that are being performed."  Three days later, on June 16, 2023, Humana, another agilon competitor, confirmed that it also was seeing "higher than anticipated non-inpatient utilization trends, predominately in the categories of emergency room, outpatient surgeries and dental services, as well as inpatient trends that have been stronger than anticipated in recent weeks, diverging from historical seasonality patterns."

43.     On August 3, 2023, during an investor earnings call discussing the Company's second quarter 2023 financial results, Defendant Sell downplayed the potential impact of increasing costs, while touting the Company's claims visibility, stating:

> [I]n terms of leading indicators and visibility.  From an operational
> standpoint, we are not just receivers of macro utilization trends.  Our

teams are actively managing utilization on the ground every day. This includes transition of care nurses, post-discharge follow-up visits, and high-risk case managers. Additionally, while [Medicare Advantage] claims data has some lag, our REACH claims data is very current through May, which is more than 90% complete. We have not seen any meaningful change in our expected cost trend, including outpatient procedures.

44.     On the same call, Defendant Bensley continued to emphasize high medical margin expectations, albeit slightly lower than two months earlier, stating "we have moderated our medical margin outlooks by approximately $30 million to a range of $500 million to $530 million." Defendant Bensley explained that "[o]ur updated outlook reflects our decision to strengthen our [Medicare Advantage] reserves in 2023 while embedding a range of scenarios on utilization and cost trend."

45.     During the Wells Fargo Healthcare Conference on September 6, 2023, despite industry cost pressures impacting many healthcare organizations, Defendant Bensley reiterated the strength and confidence in the Company's guidance issued in the second quarter of 2023, stating:

> [I]t's really interesting when we came out in Q2 and said, hey, look, based on everything that's going on in the current environment, we're going to be a little bit more conservative with the [Medicare Advantage] side of it, and we actually lowered our [Medicare Advantage] medical margin net by about $30 million and really offset that by taking our ACO REACH up -- the combination of those 2 changes, the sort of more conservative viewpoint on [Medicare Advantage]. And a really increased confidence, which I'll answer your question here in a second around ACO REACH, really gives us a huge amount of confidence in the guidance that we put out there.
>
> So, we're pretty confident with that kind of new mix that, we're confident in the guidance that we put out for -- at Q2 for 2023.

46.     The above statements identified in ¶¶ 32–45 were materially false and misleading, and failed to disclose materially adverse facts, about the Company's business and operations. Specifically, Defendants misrepresented and/or failed to disclose: (1) the severity and

unpredictability of the cost pressures on the Company's medical margin and profitability; and (2) that, as a result, Defendants' representations about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

      **C.**    **The Truth Begins to Emerges**

     47.    Investors began to learn the truth about the cost pressures impacting the Company's medical margin and profitability on November 2, 2023, when the Company announced its third quarter 2023 financial results after the market closed. Critically, agilon reported a net loss of $31 million for the third quarter of 2023 and slashed its fiscal year 2023 medical margin outlook by approximately $50 million, to a range between $455 million and $470 million. According to Defendant Sell during the Company's investor earnings call, the reduced medical margin guidance reflected "a step-up in Q2 utilization in [Medicare Advantage]" and agilon's expectation that utilization levels "will be flat through the end of the year." Defendant Sell also assured investors that the Company's more conservative approach to guidance "should reduce the risk of negative claims development next year."

     48.    On this news, the price of agilon common stock declined $3.78 per share, or more than 22% over two trading-days, from a close of $16.89 per share on November 2, 2023, to close at $13.11 per share on November 6, 2023.

     49.    A week later, after the market closed on November 10, 2023, investors gained further insight into these issues when analysts with Wells Fargo Securities, LLC issued a report cutting its price target for Company common stock from $23.00 per share to $16.00 per share and reducing its financial estimates for the Company, citing the "surprising" cost pressures impacting the Company's medical margin in light of Defendants' "continued confidence" in agilon's business model.

50.     On this news, the price of agilon common stock declined $0.15 per share, or more than 1%, from a close of $11.32 per share on November 10, 2023, to close at $11.17 per share on November 13, 2023.

51.     Despite the admissions that medical costs were increasing, on November 14, 2023, Defendant Sell spoke at the Wolfe Research Healthcare Conference, and addressed cost trends, claiming that the situation was "moderating":

> [W]e're shifting from medical margin to specifically talking about cost trend.  And what are our assumptions for the remainder of the year, specifically August through December?  Our full year cost trend guidance is $90 million higher than our initial expectations. We are 90-plus percent complete on May, June and July and those costs were $30 million higher than expected.  But as you can see, they are moderating.

52.     Then, on November 21, 2023, analysts with Deutsche Bank Securities Inc. downgraded agilon from a rating of "Buy" to "Hold," reasoning that the Company's "messy" third quarter 2023 results and "overly optimistic" medical margin financial guidance undermined analysts' confidence that agilon would meet its financial expectations in 2024 and beyond.

53.     On this news, the price of agilon common stock declined $0.52 per share, or 4.5%, from a close of $11.52 per share on November 20, 2023, to close at $11.00 per share on November 21, 2023.

54.     Investors more fully learned the truth about the cost pressures on the Company's medical margin and profitability before the market opened on January 5, 2024, when agilon updated its fiscal year 2023 financial results and provided its initial outlook for 2024.  Critically, agilon further slashed its 2023 medical margin guidance by more than $100 million, to a range between $340 million and $360 million, due to "higher-than-expected medical costs."  This represented a reduction of more than 34% from the Company's initial $550 million medical margin guidance.

14

55.     On the related investor guidance call, Defendant Sell claimed that increased medical costs only "became visible to us starting in mid-December, as we closed our November results," and indicated that agilon was "seeing cost trends that were 2 to 3x higher [than] what we had seen in 2022 in key areas like specialist costs, outpatient surgeries and Part B drugs."  Despite his earlier claims that "we are not just receivers of macro utilization trends" and "[o]ur teams are actively managing utilization on the ground every day," Defendant Sell acknowledged that agilon "failed to recognize these elevated cost trends" and had "a data and analytics gap that led to [agilon] being late in both recognizing the magnitude and source of the utilization shifts." Defendant Sell further indicated that the increased cost trends were expected to persist through 2024.  Also on January 5, 2024, Defendant Bensley announced that he would retire in 2024.

56.     On this news, the price of agilon common stock plummeted $3.45 per share, or nearly 29%, from a close of $12.08 per share on January 4, 2024, to close at $8.63 per share on January 5, 2024.

## V.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

57.      Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired agilon common stock during the Class Period (the "Class").  Excluded from the Class are Defendants, their agents, directors and officers of agilon, and their families and affiliates.

58.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

59.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

        a.      Whether Defendants violated the Exchange Act;

        b.      Whether Defendants omitted and/or misrepresented material facts;

        c.      Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

        d.      Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

        e.      Whether the price of agilon common stock was artificially inflated; and

        f.      The extent of damage sustained by members of the Class and the appropriate measure of damages.

60.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

61.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in securities class actions.  Plaintiff has no interests that conflict with those of the Class.

62.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

**VI.**    **APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE**

63.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among others:

        a.      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

        b.      The omissions and misrepresentations were material;

c.    The Company's common stock traded on an efficient market;

d.    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e.    Plaintiff and the Class purchased agilon common stock between the time the Company and the Individual Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

64.    At all relevant times, the market for the Company's common stock was efficient because: (1) as a regulated issuer, the Company filed periodic public reports with the SEC; and (2) the Company regularly communicated with public investors using established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## VII.    NO SAFE HARBOR

65.    Defendants' "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. Defendants are liable for any false or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of agilon who knew that the forward-looking statement was false. None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance

when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## VIII.    LOSS CAUSATION/ECONOMIC LOSS

66.    Defendants' wrongful conduct directly and proximately caused the economic loss suffered by Plaintiff and the Class.  The price of Company common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.  As a result of their purchases of agilon common stock during the Class Period, Plaintiff and the Class suffered economic loss, i.e., damages, under the federal securities laws.

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

67.    During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of agilon common stock during the Class Period.

## X.    CLAIMS AGAINST DEFENDANTS

### COUNT I

**Violations of Section 10(b) of the Exchange Act and
SEC Rule 10b-5 Promulgated Thereunder
Against All Defendants**

68.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

69.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and the Class; and (2) cause Plaintiff and the Class to purchase Company

common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

70.    Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices thereof in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

71.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

72.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

73.    The Individual Defendants acted as controlling persons of agilon within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Plaintiff to be misleading prior to and/or

shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

74.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the activities giving rise to the securities violations as alleged herein, and exercised the same.

75.     As described above, the Company and the Individual Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act.  As a direct and proximate result of this wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Company common stock during the Class Period.

## XI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.     Awarding compensatory damages and equitable relief in favor of Plaintiff and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.     Such other and further relief as the Court may deem just and proper.

XII.    **<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury.

Dated: March 25, 2024

**NIX PATTERSON, LLP**
By: /s/ *Jeffrey J. Angelovich*
Jeffrey J. Angelovich (Bar No. 00786988)
Cody Hill (Bar No. 24095836)
Jessica Underwood (Bar No. 24093291)
8701 Bee Cave Road
Building 1, Suite 500
Austin, TX 78746
Telephone: (512) 328-5333
Facsimile: (512) 495-1534
jangelovich@nixlaw.com
codyhill@nixlaw.com
junderwood@nixlaw.com

**KESSLER TOPAZ**
    **MELTZER & CHECK, LLP**
Naumon A. Amjed
Jonathan Z. Naji
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
namjed@ktmc.com
jnaji@ktmc.com

*Counsel for Plaintiff Patrick Harris Hope*